UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| UNDRAY KNIGHTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:18-cv-00245-JPH-MJD |
| | ) | |
| BYRD, | ) | |
| K. HOBSON, | ) | |
| S. LANTRIP, | ) | |
| F. JEFFERY, | ) | |
| DONALDSON, | ) | |
| | ) | |
| Defendants. | ) | |

**ENTRY GRANTING MEDICAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

Plaintiff Undray Knighten brought this civil rights action under 42 U.S.C. § 1983. He

alleges that his constitutional rights were violated while imprisoned at Wabash Valley Correctional

Facility ("WVCF"). In his Eighth Amendment deliberate indifference claims against Dr. Samuel

Byrd, Nurse Kimberly Hobson, Sergeant S. Lantrip, Correctional Officer F. Jeffery, and Sergeant

Donaldson, *see* dkt. 12,[1] Mr. Knighten alleges that the defendants were deliberately indifferent to

his serious medical needs. Dr. Byrd and Nurse Hobson have moved for summary judgment. Dkts.

46–48, 51.[2] For the reasons explained below, the Court **grants** their motion, dkt. [46].

---

[1] The Court refers to Dr. Byrd and Nurse Hobson as the "Medical Defendants." The Court refers to Sergeant Lantrip, Correctional Officer Jeffery, and Sergeant Donaldson as the "State Defendants." The **clerk is directed** to update the Medical Defendants' names on the docket to Dr. Samuel Byrd and Nurse Kimberly Hobson.

[2] The State Defendants did not move for summary judgment.

## I.       Summary Judgment Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Gekas v. Vasiliades*, 814 F.3d 890, 896 (7th Cir. 2016). The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009), *abrogated on other grounds recognized by Jones v. Carter*, 915 F.3d 1147, 1149–50 (7th Cir. 2019).

To survive a motion for summary judgment, the non-moving party must set forth specific, admissible evidence showing that there is a material issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). An affidavit used as support must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated. Fed. R. Civ. P. 56(c)(4).   Statements that fall "outside the affiant's personal knowledge or statements . . . are the result of speculation or conjecture or [are] merely conclusory do not meet this requirement." *Stagman v. Ryan*, 176 F.3d 986, 995 (7th Cir. 1999). Likewise, unsworn statements do not meet the requirements of Rule 56. *See Collins v. Seeman*, 462 F.3d 757, 760 n.1 (7th Cir. 2006).

The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Skiba v. Ill. Cent. R.R. Co.*, 884 F.3d 708, 717 (7th Cir. 2018). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *See Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). The Court need only consider the cited materials, but it may consider other materials in the

record. Fed. R. Civ. P. 56(c)(3). The Seventh Circuit Court of Appeals has repeatedly assured the district courts that they are not required to "scour every inch of the record" for evidence that is potentially relevant to the summary judgment motion before them. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 572–73 (7th Cir. 2017).

A dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If no reasonable jury could find for the non-moving party, then there is no "genuine" dispute. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Not every factual dispute between the parties will prevent summary judgment, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Finally, although *pro se* filings are construed liberally, *pro se* litigants such as Mr. Knighten are not exempt from procedural rules. *See Pearle Vision, Inc. v. Romm*, 541 F.3d 751, 758 (7th Cir. 2008) (noting that "*pro se* litigants are not excused from compliance with procedural rules"); *Members v. Paige*, 140 F.3d 699, 702 (7th Cir. 1998) (stating that procedural rules "apply to uncounseled litigants and must be enforced").

## II.     Facts

The Medical Defendants filed a statement of material facts not in dispute. *See* dkt. 47 at 2– 12. In his response and surreply, Mr. Knighten identifies some facts that he contends are disputed. *See* dkt. 55 at 2–12; dkt. 57 at 1–4. The Court accepts those facts as true to the extent they are supported by admissible evidence in keeping with its duty to construe the record in the light most favorable to Mr. Knighten.[3]

---

[3] Mr. Knighten's response and surreply are not verified. *See* dkts. 55, 57. Thus, the Court does not consider statements made in those documents that are not supported by admissible evidence (e.g. deposition

### A.      Mr. Knighten's Medical History

Mr. Knighten has had dizzy spells since approximately 2000. Dkt. 51 at 111:2–7. In 2003 or 2004, while incarcerated at the Bartholomew County Jail, Mr. Knighten had a dizzy spell, fell, and broke his finger. *Id.* at 41:6–10, 42:25–43:6. Jail officials sent him to have surgery on his finger. *Id.* at 41:6–10. In 2006 and 2007, while incarcerated at the Indiana State Prison ("ISP"), Mr. Knighten also had dizzy spells and associated falls. Dkt. 51 at 43:7–11; dkt. 55-1 at 4, 6, 7. The dizzy spells were connected to migraine headaches. Dkt. 51 at 101:17–19; dkt. 55-1 at 6, 7. A doctor at ISP tried to treat the problem by giving Mr. Knighten medicine for migraines, adjusting his migraine medicine, and prescribing a muscle relaxer. Dkt. 51 at 101:2–17.

In 2008, Mr. Knighten had surgery to remove cancer in his rectum; he also had radiation and chemotherapy to treat the cancer. Dkt. 25-1 at 2; Dkt. 51 at 64:13. His cancer was successfully treated, but he was left with irritable bowel syndrome, a condition that makes it difficult for him to control his bowels and causes chronic diarrhea. Dkt. 25-1 at 2; Dkt. 51 at 26:3–4. To control his diarrhea, doctors gave him medications that caused constipation as a side effect. Dkt. 51 at 62:24–63:21, 64:20–65:5.

In 2015, Mr. Knighten had dilation surgery because he was suffering from anal stenosis.[4] Dkt. 51 at 64:8–19. Later that year, he was transferred to WVCF. *Id.* at 66:5–6.

---

testimony). *See Collins*, 462 F.3d at 760 n.1. The Court also notes that much of Mr. Knighten's response focuses on allegations of inadequate medical care by providers other than Dr. Byrd and Nurse Hobson (including complaints about his medical care at Pendleton Correctional Facility before he came to WVCF and at the Indiana State Prison after he left WVCF). *See, e.g.*, dkt. 55 at 3, 10–12. In addition to being unsworn, those allegations are not relevant because they are directed to providers who are not defendants here. Finally, the Court notes that Mr. Knighten's response includes many statements that non-defendant doctors allegedly made to him. *See, e.g.*, *id.* at 3–4 (recounting statements from Dr. George), 9 (recounting statements from doctor who performed CT scan). Even if these statements were sworn, the Court would not consider them to the extent they are offered for the truth of the matter asserted because they are inadmissible hearsay. *See Carlisle v. Deere & Co.*, 576 F.3d 649, 655–56 (7th Cir. 2009) (court may not consider inadmissible hearsay at summary judgment).

[4] Anal stenosis, also known as anal stricture, is the narrowing of the anal canal. *See* http://ddc.musc.edu/public/diseases/colon-rectum/anal-stenosis.html (last visited March 5, 2020).

**B.      Dr. Byrd and Nurse Hobson**

Dr. Byrd is a physician licensed to practice medicine in the State of Indiana. Dkt. 48-2 ¶ 2.

He is employed by Wexford of Indiana, LLC, as a physician at WVCF. *Id.* ¶ 3.

Nurse Hobson is a registered nurse licensed in the State of Indiana. Dkt. 48-1 ¶ 2. At all

times relevant to Mr. Knighten's lawsuit, she has been employed by Wexford of Indiana, LLC, as

the Healthcare Services Administrator ("HSA") at WVCF. *Id.* ¶ 3.

As the HSA, Nurse Hobson's role is purely administrative. *Id.* She orders medical supplies,

hires medical staff, maintains the nursing staff schedule, responds to inmate grievances about

medical issues, and deals with human resources issues for the medical staff. *Id.* She does not

generally perform any nursing duties, although she sometimes fills in as a nurse when the facility

is short-staffed. *Id.* When she does so, Nurse Hobson assesses patients, takes their vital signs,

reports her findings to the provider (a physician, physician's assistant, or nurse practitioner), refers

patients to the provider (if needed), and follows orders from providers (such as administering and

dispensing medications). *Id.* She also enters provider orders into patients' electronic medical

records. *Id.* She does not prescribe medications, order diagnostic testing, diagnose patients,

develop treatment plans, or dictate medical care. *Id.* Nurse Hobson does not supervise providers

and cannot instruct them on how to evaluate or treat patients. *Id.* ¶ 4. She is not the nursing

supervisor. *Id.*

**C.      Medical Treatment at WVCF**

In late November 2017, Mr. Knighten stood up from his bed, had a dizzy spell, passed out,

and hit his face on the concrete floor. Dkt. 51 at 10:17–11:7, 17:13–18, 31: 15–16, 97:3–7.[5] He

---

[5] In his unsworn response, Mr. Knighten claims that he complained to Dr. Byrd about his health problems "for most of 2017" and that he tried to explain to Dr. Byrd that severe anal stenosis had caused similar problems in the past, but Dr. Byrd disagreed. Dkt. 55 at 4. Unsworn statements are not admissible at summary judgment, *see Collins*, 462 F.3d at 760 n.1, and the Court does not credit these statements here.

was not able to consult with a physician about the problem until he saw Dr. Byrd on December 20, 2017. *Id.* at 31:15–16, 98:8–9; Dkt. 25-1 at 2.[6]

On that day, Dr. Byrd saw Mr. Knighten for a chronic care visit. Dkt. 25-1 at 2, 8–11. At that time, Mr. Knighten's irritable bowel syndrome was fairly controlled with the medications Pamelor and Calan (also known as Verapamil). *Id.* at 2. Mr. Knighten was also prescribed Flomax for urinary retention due to an enlarged prostate. *Id.* Dr. Byrd's treatment notes state that Mr. Knighten's anorectal stricture had been a problem in the past but was stable now and that Mr. Knighten had noted improvement with Calan. *Id.* at 8. The treatment notes also state that Mr. Knighten was "evaluated by Colorectal surgery group in Indianapolis since last visit and stenosis not felt to be significant at this time" and that "[a]t this point we are > 5 yrs since surgical intervention and should simply repeat colonoscopy and CT scans on symptomatic vs. [every] 6mos to yearly basis." *Id.*

At the December 20th appointment, Mr. Knighten reported that he had fainted a couple times over the last month, describing the problem as lightheadedness and "passing out" after changing positions. Dkt. 25-1 at 2, 9. Dr. Byrd viewed these symptoms as a classic presentation of orthostatic hypotension, which is a form of low blood pressure that happens when a person stands up after sitting or lying down. *Id.* at 2. Common signs of orthostatic hypotension are dizziness, burry vision, weakness, fainting, confusion, and nausea. *Id.* There are many possible causes of orthostatic hypotension, including dehydration, heart conditions, and certain medications. *Id.*

Based on the diagnosis of orthostatic hypotension, Dr. Byrd ordered a chest X-ray, an electrocardiogram ("ECG"), and a variety of blood tests. *Id.* The chest X-ray was performed on January 5, 2018 and was normal. *Id.* at 2, 121. The ECG was performed on January 12, 2018. *Id.*

---

[6] Mr. Knighten does not blame Dr. Byrd for the delay between his fall and the December 20, 2017, appointment. Dkt. 51 at 98–99.

at 122. It showed a prolonged QT interval, which is abnormal. *Id.* at 2. A prolonged QT interval can cause dizziness and fainting, and Pamelor and Flomax can cause a prolonged QT interval. *Id.* Blood for lab work was drawn on January 17, 2018. *Id.* at 17. The lab results were mostly unremarkable, except for a high sed rate and a low hemoglobin reading. *Id.* at 2. Dr. Byrd did not believe that the abnormal labs likely explained Mr. Knighten's symptoms. *Id.* Because Mr. Knighten did not have a history of a long QT or other arrythmias, Dr. Byrd decided to discontinue the Pamelor and reduce his Flomax dose while monitoring the orthostatic symptoms. *Id.* at 2–3.

While that testing was occurring, Mr. Knighten developed another problem. On or about December 29, 2017, Mr. Knighten found what he believed to be bugs or parasites on his body. Dkt. 51 at 34:14–17; *see also* dkt. 25-1 at 13. According to Mr. Knighten, he told a sergeant, who in turn called a "psych nurse doctor" and said that she should come talk to Mr. Knighten because the sergeant thought Mr. Knight was "going crazy." Dkt. 51 at 21–23. The mental health care worker talked to Mr. Knighten and sent him back to his cell. *Id.* at 23–25.

About a month later, Nurse Hobson and another female provider saw Mr. Knighten at the infirmary. *Id.* at 66:18–67:22. Mr. Knighten does not know the name of the other provider but believes she was a physician or nurse practitioner. *Id.* at 67:21–68:3. Mr. Knighten believes that his sister talked to Nurse Hobson about his complaints that he had bugs on his skin, which led Nurse Hobson to call him to the infirmary. *Id.* at 68:21–69:5. Mr. Knighten testified that he "kept trying to show them, and they kept back and said, 'No, we don't want to see. Just take your shirt off.'" *Id.* at 67:6–8.[7] He took his shirt off, and then the female provider examined Mr. Knighten while Nurse Hobson served as a witness. *Id.* at 67:9–15, 68:14–17. The provider squeezed his back

---

[7] In his unsworn summary judgment response, Mr. Knighten claims that he told Nurse Hobson and the other provider that he did not know what was on his back and tried to show them what was on his face and legs, but they did not want to examine his face and legs. Dkt. 55 at 10. Unsworn statements are not admissible at summary judgment, *see Collins*, 462 F.3d at 760 n.1, and the Court does not credit these statements.

and said that Mr. Knighten had blackheads. *Id.* at 67:9–12. Nurse Hobson did not examine Mr. Knighten, but she did look at the discharge the female provider had squeezed from Mr. Knighten's back and agreed that he had blackheads. *Id.* at 74:16–75:13; Dkt. 25-1 ¶ 6. At his deposition, Mr. Knighten admitted that Nurse Hobson relied on the female provider's diagnosis. Dkt. 51 at 75:19–21. After the examination, Nurse Hobson told Mr. Knighten to go back to his cell, although he kept trying to explain that he did not have blackheads and asked how he could have blackheads when the discharge on his skin was white. *Id.* at 69:7–8, 75:10–13.

On February 7, 2018, Mr. Knighten saw Dr. Byrd again. Dkt. 25-1 at 19–22. Mr. Knighten reported that he had had two fainting spells since the last visit. *Id.* Dr. Byrd noted that Pamelor had been decreased over the last six weeks and would be stopped that day. *Id.* Given that Dr. Byrd was stopping Pamelor, Mr. Knighten asked to be prescribed Lomotil to control his diarrhea and noted that Imodium had been ineffective in the past. *Id.* Dr. Byrd asked him to try Bentyl and Imodium in combination rather than Lomotil. *Id.* They also discussed Mr. Knighten's recent and abnormal weight loss (40 pounds in eight months). *Id.* Given Mr. Knighten's history of cancer, Dr. Byrd ordered a CT scan of the abdomen and pelvis with contrast. *Id.* at 19, 25. The treatment notes for the February 7 visit also suggest that Dr. Byrd added a prescription for Cleocin (also known as Clindamycin, an antibiotic cream) on that date, although the treatment notes do not expressly discuss any skin issues. *Id.* at 21. In an affidavit, Dr. Byrd stated that he prescribed Cleocin for Mr. Knighten's skin condition. *Id.* at 5.

On March 11, 2018, Mr. Knighten requested health care. *Id.* at 32. He stated that he did not have blackheads, but instead had "some kind of parasite worm that's causing [him] all the health problems [he had] had in the past year." *Id.* Dr. Byrd saw Mr. Knighten again on March 14. *Id.* at 35–39. During the visit, Mr. Knighten reported that Bentyl did not add much to his treatment

regimen. *Id.* at 35. He did, however, report improvement with Calan when he could get it, noting that the pharmacy had had trouble filling the prescription in a timely fashion. *Id.* Dr. Byrd's treatment notes indicate that he planned to titrate Mr. Knighten's Bentyl levels and that he requested a renewal of Calan. *Id.* at 38. Dr. Byrd also noted that Mr. Knighten was scheduled for a CT scan. *Id.* at 35.

During the March 14th appointment, Mr. Knighten also complained about having "little white bugs" all over his body. *Id.* at 4, 36. He believed they were hookworms. *Id.* Hookworms are parasites. *Id.* at 4. They enter the body as larvae through hair follicles in the hands and feet, which can cause a significant inflammatory reaction on the skin. *Id.* The larvae then travel to the heart and eventually make their way to the gastrointestinal tract, where they develop into adult hookworms and feed off the blood vessels in the intestines until they die. *Id.* at 4–5. Hookworms do not exit the body in adult form. *Id.* at 5.

Dr. Byrd examined Mr. Knighten's skin and found only closed comedones and excoriations over various skin surfaces.[8] *Id.* at 38. Dr. Byrd believed that what Mr. Knighten thought were "little white bugs" and "worms" was actually just dead skin in the form of blackheads that he could squeeze out, not hookworms. *Id.* at 5, 36. Dr. Byrd believed that, if Mr. Knighten really had a hookworm infection, he likely would have presented with severe itching, blisters, and a red growing rash, not little white bumps that he could extract by squeezing the skin. *Id.* at 5. Nonetheless, Dr. Byrd ordered a parasite and ova test of Mr. Knighten's stool. *Id.* at 5, 28. During the visit, Dr. Byrd apparently told Mr. Knighten hookworms are far too large to invade single skin pores. *Id.* at 35. According to Mr. Knighten, Dr. Byrd also laughed at him and told him he had been "locked up too long," "was getting crazy," and did not "know what [he was] talking about."

---

[8] Comedones are small, flesh-colored, white, or dark bumps that give skin a rough texture; they are caused by acne. *See* https://www.mountsinai.org/health-library/symptoms/comedones (last visited March 5, 2020).

Dkt. 51 at 108:18–24. After the appointment, though, Dr. Byrd sent Mr. Knighten a note stating, "I stand corrected" because "[i]t appears larvae (not mature adult form [hookworms]) cause a cutaneous infection prior to ultimately leading to an intestinal infection." Dkt. 51 at 108:25–109:3; Dkt. 55-1 at 21. He noted, though, that "a significant inflammatory reaction would take place" and "you certainly don't appear to have a larvae infestation." Dkt. 55-1 at 21. He wrote that he was ordering stool testing for parasites and enclosed an article about hookworms. *Id.* at 21–26.

On March 23, 2018, Mr. Knighten saw a nurse after asking Dr. Byrd to "change the little blue pills that you got me taking for my diarrhea" because "they make me use the toilet more." Dkt. 25-1 at 40. Notes from the nurse visit state that the physician was contacted and that Bentyl was stopped and fiber added at the direction of the physician. *Id.*

On April 20, 2018, Mr. Knighten had a CT scan. Dkt. 25-1 at 120. The technician was unable to use IV contrast, so the scan was performed with oral contrast only. *Id.* Dr. Byrd followed up with Mr. Knighten on April 25, 2018. *Id.* at 49. Dr. Byrd told Mr. Knighten that the results were remarkable for a large amount of stool in the colon. *Id.* at 3, 49. Dr. Byrd's treatment notes reflect that Mr. Knighten claimed that the excess stool would not have happened if Dr. Byrd had given him Lomotil instead of Imodium and stated that he was having 20 bowel movements a day. *Id.* at 49. The treatment notes reflect that Dr. Byrd assessed Mr. Knighten as having "difficulty passing stool," discontinued Imodium, and ordered lactulose.[9] *Id.* at 51. They also reflect that Dr. Byrd ordered another CT scan with contrast to evaluate Mr. Knighten's unexplained weight loss. *Id.* Dr. Byrd also ordered another stool sample because the previous stool studies he had ordered had not been performed by the lab. *Id.*

---

[9]Lactulose    is    a    synthetic    sugar    used    to    treat    constipation. *See* https://medlineplus.gov/druginfo/meds/a682338.html (last visited March 20, 2020).

Mr. Knighten had another CT scan on May 25, 2018. *Id.* at 117. This time, the provider was able to use IV contrast. *Id.* The report for the scan does not mention hookworms (or any other kind of worm or parasite). *Id.* at 118–19. Dr. Byrd met with Mr. Knighten to discuss the scan on May 30, 2018. *Id.* at 3, 66. Dr. Byrd explained that the scan showed an increased colonic stool volume; a mid abdominal segmental small bowel adynamic ileus;[10] and a nonspecific presacral soft tissue abnormality, which suggested inflammatory or infectious change. *Id.* at 66, 118. Dr. Byrd believed the amount of stool in Mr. Knighten's colon was inconsistent with his complaints of diarrhea, but Mr. Knighten believed it was because Dr. Byrd discontinued Pamelor and started Bentyl and Imodium.[11] *Id.* at 3, 66. Dr. Byrd explained that using medications that could slow motility through the gut (like Pamelor, Lomotil, or Imodium) would be a bad idea. *Id.* Mr. Knighten reported good results from using probiotics in the past, so Dr. Byrd agreed to provide them for him. *Id.* Mr. Knighten also asked for an evaluation with a gastroenterologist based on the CT scan results, and Dr. Byrd agreed. *Id.* at 66.

During the May 30 appointment, Dr. Byrd and Mr. Knighten also discussed Mr. Knighten's dizziness and fainting spells. *Id.* at 67. Mr. Knighten reported multiple episodes since the last visit. *Id.* Dr. Byrd noted that Pamelor had been discontinued since their last visit without resolution. *Id.* He also noted that blood work performed on May 3 showed that Mr. Knighten's hemoglobin levels had improved and that his ESR had normalized. *Id.* Dr. Byrd ordered another ECG and also ordered orthostatic blood pressure measurements. *Id.* Dr. Byrd also decided to decrease Mr. Knighten's dose of Calan because it can cause orthostatic hypotension and contribute to gastrointestinal

---

[10] Ileus means lack of movement. *See* Dkt. 25-1 at 3.

[11] In his response and surreply, Mr. Knighten states that he told Dr. Byrd the CT scans showed a large amount of stool in the colon because he took extra Imodium before the scans in an attempt to induce constipation so that he would not have to miss the scan appointments due to his recurrent diarrhea. Unsworn statements are not admissible at summary judgment, *see Collins*, 462 F.3d at 760 n.1, and the Court does not credit these statements here.

motility issues. *Id.* at 3, 68. Dr. Byrd believed the risk of increasing symptoms associated with Mr. Knighten's irritable bowel syndrome was outweighed by the potential benefit of decreasing Mr. Knighten's dizziness and fainting spells. *Id.* at 3. Dr. Byrd also ordered compression stockings for Mr. Knighten. *Id.* at 3, 68. According to Mr. Knighten, Dr. Byrd gave him the compression stockings after he complained that his toes would tingle when he used the toilet, saying that they were for poor circulation. Dkt. 51 at 107.

Mr. Knighten's medical records show that Betamethasone cream was added as a prescription around June 12, 2018. *See* Dkt. 25-1 at 78 (Betamethasone first appearing on Mr. Knighten's medication lists). In an affidavit, Dr. Byrd stated that he prescribed Betamethasone to treat Mr. Knighten's skin condition. *Id.* at 5.

Mr. Knighten had a repeat ECG on June 15, 2018. *Id.* at 115. The results were normal. *Id.* at 4, 115. A medical staff member also performed orthostatic blood pressure measurements (measuring the blood pressure while lying down, sitting, and standing) on June 15. *Id.* at 114. Dr. Byrd found those results to be unremarkable. *Id.* at 4, 114.

Mr. Knighten saw a gastroenterologist on June 20, 2018. *Id.* at 113. The gastroenterologist recommended a colonoscopy. *Id.* at 4, 113.

Dr. Byrd saw Mr. Knighten on June 29, 2018 and told him that the gastroenterologist had recommended a colonoscopy. *Id.* at 4, 94. Dr. Byrd wrote in his treatment notes that he would request a colonoscopy. *Id.* at 96. During the visit, Dr. Byrd and Mr. Knighten also discussed Mr. Knighten's weight loss, with Dr. Byrd noting that Mr. Knighten had gained five pounds in the last month. *Id.* at 4, 94. Dr. Byrd also wrote in his treatment notes that Mr. Knighten's most recent CT scan results suggested the probable recurrence of significant anorectal stenosis. *Id.* at 94. During the visit, Mr. Knighten repeated his belief that he had a parasitic infection and noted that the lab

technicians kept processing his stool samples incorrectly. *Id.* at 94. Dr. Byrd wrote in his treatment notes that he simply did not believe that Mr. Knighten had a parasitic infection, but rather seborrhea of the face and significant production of skin oil. *Id.* at 94. He noted that Mr. Knighten's skin had improved significantly after he prescribed Betamethasone and Cleocin. *Id.* He also noted that Mr. Knighten requested more Betamethasone because the tube Dr. Byrd prescribed lasted only two weeks. *Id.*

During the June 29 visit, Mr. Knighten also reported that he had not fainted since the last visit but explained that he still had dizzy spells, during which he stopped what he was doing and squatted down until the dizzy spell passed. Dkt. 51 at 105:2–12. Dr. Byrd noted that Mr. Knighten's ECF and orthostatic vital signs were unremarkable. Dkt. 25-1 at 94. He opined that discontinuing Pamelor and reducing the dose of Flomax and Calan seemed to have resolved the orthostatic hypotension and fainting spells. *Id.* at 4, 94. Mr. Knighten requested an increase to his Calan dose because Calan was helpful for diarrhea. *Id.* at 94. Dr. Byrd cautioned him about the danger of dizziness and fainting spells but agreed to increase the dose on the condition that Mr. Knighten inform the medical department if the dizziness and fainting recurred. *Id.*

Mr. Knighten had a colonoscopy on July 25, 2018. *Id.* at 108. The doctor could not use a normal colonoscope because of anal stenosis. *Id.* Instead, a pediatric colonoscope was inserted. *Id.* The doctor found anal stricture on digital rectal exam, but the exam was otherwise normal. *Id.* Based on the colonoscopy report, Dr. Byrd planned to send Mr. Knighten to a colorectal surgeon to see if he was a candidate for anoplasty to release the stricture. *Id.* at 4. Mr. Knighten ultimately underwent surgery to release the stricture in the fall of 2018. *See* Dkt. 51 at 95 (noting at November 5, 2018, deposition that rectum was dilated a few weeks ago).

13

Dr. Byrd saw Mr. Knighten again at the chronic care clinic on June 12, 2019. Dkt. 48-2 at 2. He had not reported a fainting episode in over a year, although he said he sometimes felt dizzy and had to sit down to wait for the episode to pass. *Id.* Dr. Byrd opined that such symptoms are common in patients with orthostatic hypotension. *Id.* In his affidavit, Dr. Byrd stated that they continue to work together to adjust Mr. Knighten's medications to relieve his gastrointestinal symptoms without causing further dizziness or fainting. *Id.* He also stated that Mr. Knighten reported that the corticosteroid he prescribed for Mr. Knighten's skin rash had provided excellent results. *Id.* He opined that there was no clinical indication that Mr. Knighten had hookworms or another parasite. *Id.* He stated that Mr. Knighten's anal stricture is stable and that his weight has increased and is stable. *Id.*

Mr. Knighten admits that the symptoms associated with what he believes to be a parasitic infection had resolved by August or September 2018, *see* dkt. 51 at 92:7–12, but denies that Dr. Byrd's prescribed treatments were helpful, *see id.* at 92:15–20. Instead, he attributes the improvement in his condition to three factors: (1) washing his skin with an ointment called "Care All Muscle and Joint Vanishing Scent Gel Quick Relief" that he bought from the commissary; (2) putting garlic powder on all his food because his cousin told him that garlic powder is a home remedy for parasites; and (3) taking the liquid laxatives Dr. Byrd prescribed for constipation to "clear [his] system out." *Id.* at 52:1–23, 88:3–25.

As reflected in Dr. Byrd's treatment notes, there were problems in the execution of his orders for stool samples. According to Mr. Knighten, he provided a sample, but the lab would not process it because Mr. Knighten's name was not on the sample by the time it reached the lab. Dkt. 51 at 70:7–21. Mr. Knighten's sister called Nurse Hobson about the problem, and Nurse Hobson sent another nurse to collect another sample. *Id.* at 70:22–23, 71:10–14. Mr. Knighten provided

14

another sample, but, this time, the sample could not be tested because the nurse who collected it failed to put it in the freezer after it was collected. *Id.* at 71:1–5. Mr. Knighten's sister called Nurse Hobson again, and she again sent another nurse to collect a sample. *Id.* at 71:10–14. That sample also apparently was not tested, although the reason is not disclosed by the record. Mr. Knighten admits that Nurse Hobson had no personal involvement in the apparent mishandling of his stool samples. *Id.* at 71:15–72:11. In an affidavit, Dr. Byrd stated that hookworms would have been identified on the two CT scans and colonoscopy that Mr. Knighten had in 2018. Dkt. 25-1 at 5. At his deposition, Mr. Knighten testified that he asked the doctor who performed the colonoscopy whether they were testing for parasites and he told him that the purpose of the colonoscopy was only to check for cancer. Dkt. 51 at 94:15–95:7.[12]

At his deposition, Mr. Knighten also testified that he kept telling Dr. Byrd to send him back to the place he previously had dilation surgery because he was having the same problem. *Id.* at 91:9–14. He testified, "I kept trying to tell him about my medication, about going out to be dilated. He didn't want to do it. I kept trying to tell him about . . . my problem with the diarrhea and all of that. Instead of doing something about it, he cut the meds off, he discontinued the medication." *Id.* at 91:10–16. He also complained that Dr. Byrd never sent him to be treated for parasites or another type of organism. *Id.* at 92:5–12. Finally, he testified that he told Dr. Byrd that he had dizziness and fainting spells before he began taking Pamelor and Calan; that he told Dr. Byrd that decreasing Pamelor and Calan did not help with his dizziness; and that he thought Dr. Byrd was deliberately

---

[12] In his unsworn response brief, Mr. Knighten also claims that the doctors who performed his CT scans also told him that they were testing only for cancer. Dkt. 55 at 9. Such unsworn statements are not admissible at summary judgment, *see Collins*, 462 F.3d at 760 n.1, and the Court does not credit them. Regardless, these statements are also inadmissible hearsay to the extent that they are offered for the truth of the matter asserted. *See Carlisle*, 576 F.3d at 655–56.

indifferent because he is still having dizzy spells but has not seen an outside doctor about them. *Id.* at 91:19–92:4, 100:11–18, 102:2–10, 103:4–7.

### III.    Discussion

Mr. Knighten asserts Eighth Amendment medical care claims against the Medical Defendants. At all times relevant to Mr. Knighten's claim, he was a convicted offender. Accordingly, his treatment and the conditions of his confinement are evaluated under standards established by the Eighth Amendment's proscription against the imposition of cruel and unusual punishment. *See Helling v. McKinney*, 509 U.S. 25, 31 (1993) ("It is undisputed that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment.").

Pursuant to the Eighth Amendment, prison officials have a duty to provide humane conditions of confinement, meaning, they must take reasonable measures to guarantee the safety of the inmates and ensure that they receive adequate food, clothing, shelter, and medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To prevail on an Eighth Amendment deliberate indifference medical claim, a plaintiff must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about the plaintiff's condition and the substantial risk of harm it posed but disregarded that risk. *Id.* at 837; *Pittman v. Cty. of Madison*, 746 F.3d 766, 775 (7th Cir. 2014). "To determine if the Eighth Amendment has been violated in the prison medical context, [courts] perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual defendant was deliberately indifferent to that condition." *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc).

16

For purposes of summary judgment, the Medical Defendants do not dispute that Mr. Knighten suffered from serious medical conditions under the Eighth Amendment; instead, they argue that they were not deliberately indifferent to those conditions. *See* dkt. 47 at 14–20.

"[C]onduct is 'deliberately indifferent' when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed [and] decided not to do anything to prevent that harm from occurring even though he could have easily done so." *Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal quotation marks and quoted authority omitted). "If a risk from a particular course of medical treatment (or lack thereof) is obvious enough, a factfinder can infer that a prison official knew about it and disregarded it." *Petties*, 836 F.3d at 729. But "in cases where unnecessary risk may be imperceptible to a lay person[,] a medical professional's treatment decision must be such a substantial departure from accepted medical judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Id.* (internal quotation marks and quoted authority omitted). In other words, "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have [recommended the same] under those circumstances." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (internal quotation marks and quoted authority omitted). "Disagreement between a prisoner and his doctor, or even between two medical professionals, about the proper course of treatment generally is insufficient, by itself, to establish an Eighth Amendment violation." *Id.*

## A.    Nurse Hobson

Mr. Knighten deliberate indifference claim against Nurse Hobson arises from the examination that took place in approximately late January 2018. *See* dkt. 55 at 10. But the undisputed evidence shows that Nurse Hobson did not examine Mr. Knighten. Instead, after

learning that Mr. Knighten was complaining about having bugs on his skin, she called Mr. Knighten to the infirmary and served as a witness while another provider (who was probably a physician or nurse practitioner) examined him. That provider said that Mr. Knighten had blackheads, and Nurse Hobson agreed after seeing the discharge that the provider had removed from Mr. Knighten's back.

This is not a case where the risk from Nurse Hobson's acquiescence in the provider's decision not to provide treatment is obvious to a layperson. Thus, Nurse Hobson's decisions are entitled to a great deal of deference. *See Petties*, 836 F.3d at 729; *Pyles*, 771 F.3d at 409. Further, there is no evidence that Nurse Hobson knew or even suspected that Mr. Knighten was suffering from anything more blackheads; no evidence that she disregarded a risk of serious harm to him; and no evidence that her chosen course of action (asking a provider to examine him and then sending him away without immediate treatment) was a substantial departure from accepted medical practice. The fact that Mr. Knighten disagreed with the conclusion that he had blackheads is not sufficient on its own to support an Eighth Amendment deliberate indifference claim. *See Pyles*, 771 F.3d at 409. As such, Mr. Knighten's deliberate indifference claims against Nurse Hobson fail.

At his deposition, Mr. Knighten also testified that he was suing Nurse Hobson because he believed she was the nursing supervisor and, thus, responsible for the problems the medical staff apparently experienced in collecting a usable stool sample from him. Dkt. 51 at 72:3–11, 76:9–78:7. He does not renew that argument in his response brief but even if he did, it fails because the undisputed evidence shows that Nurse Hobson is not the nursing supervisor. And even if she were, she could not be held vicariously liable for the failings of her subordinates. *See Paine v. Cason*, 678 F.3d 500, 512 (7th Cir. 2012). Instead, she can only be held liable for her own actions. *Id.*

Here, the undisputed evidence shows that, whenever Mr. Knighten's sister contacted Nurse Hobson about a failed stool sample, Nurse Hobson sent a staff member to collect another sample. Such facts do not support a claim of deliberate indifference.

Accordingly, Nurse Hobson's motion for summary judgment is granted.

**B.    Dr. Byrd**

**1.    Complaints of Parasitic Infection**

Mr. Knighten contends that Dr. Byrd was deliberately indifferent to his complaints that he had a parasitic infection because Dr. Byrd never treated him (or sent him out to be treated) for parasites or any other type of organism. Dkt. 51 at 92:7–12. But that's not what the undisputed evidence shows.   When Mr. Knighten complained about having bugs on his skin, Dr. Byrd examined him and found only blackheads. Dr. Byrd did not believe that Mr. Knighten had a parasitic infection because such an infection would cause significant skin inflammation, not just the white debris he was expressing from his pores. Dr. Byrd nonetheless ordered stool samples so that Mr. Knighten could be tested for parasites. The tests were never completed, but no evidence suggests that Dr. Byrd was responsible for that failure. Moreover, Mr. Knighten ultimately had two CT scans and a colonoscopy, all of which Dr. Byrd believes would have shown hookworms if they had been present. Finally, the undisputed evidence shows that Mr. Knighten's skin condition resolved after Dr. Byrd prescribed Cleocin and Betamethasone to treat blackheads.

On these facts, no reasonable jury could conclude that Dr. Byrd was deliberately indifferent to Mr. Knighten's complaints about having a parasitic infection. Instead, the facts show that Dr. Byrd took the complaints seriously, investigated them, and ultimately concluded that Mr. Knighten had another condition (blackheads) and treated him for that condition. As with Nurse Hobson, this is not a case where the risk of failing to treat for a parasitic infection is obvious; thus, Dr. Byrd's

19

decisions are entitled to considerable deference. *See Petties*, 836 F.3d at 729; *Pyles*, 771 F.3d at 409. Further, there is no evidence that Dr. Byrd knew Mr. Knighten had a parasitic infection; that he disregarded a serious risk of harm to Mr. Knighten; or that his chosen course of treatment was a substantial departure from accepted medical practice. The fact that Mr. Knighten believes he had a parasitic infection instead of blackheads is insufficient to support an Eighth Amendment claim. *See Pyles*, 771 F.3d at 409. As such, Mr. Knighten's claim that Dr. Byrd was deliberately indifferent to his complaints about having a parasitic infection fail.

Mr. Knighten contends that there is a genuine issue of material fact because he asked the doctor who performed his colonoscopy whether they were testing for parasites and the doctor told him that the colonoscopy was intended only to detect the recurrence of cancer. Dkt. 51 at 94:15–95:7; *see also* dkt. 55 at 9. Such inadmissible hearsay cannot be considered at summary judgment. *See Carlisle*, 576 F.3d at 655–56. Regardless, the fact that the doctor who performed the colonoscopy told Mr. Knighten that he was being screened for cancer, not parasites, does not undermine Dr. Byrd's sworn statements that he believed the colonoscopy (and the CT scans) would have revealed the existence of parasites if they had existed.

Mr. Knighten also disputes that Dr. Byrd's course of treatment was effective, claiming that he treated himself by using an over-the-counter gel on his skin, adding garlic powder to his food, and using a liquid laxative to clear out his system. Dkt. 52:1–23, 88:3–25. Any dispute about the reason for Mr. Knighten's recovery is, however, immaterial because Mr. Knighten does not designate admissible evidence showing that he told Dr. Byrd about his self-help remedies or other evidence from which a jury could infer that Dr. Byrd knew his course of treatment was not working. Instead, the undisputed record evidence shows that Mr. Knighten's condition improved after Dr. Byrd prescribed Betamethasone, that Mr. Knighten asked Dr. Byrd for more

Betamethasone, and that Mr. Knighten's condition had resolved by August or September 2018. On those facts, no reasonable jury could conclude that Dr. Byrd was deliberately indifferent to the possibility that Mr. Knighten had a parasitic infection, even if it believed that Mr. Knighten had cured himself.

Finally, Mr. Knighten complains that Dr. Byrd laughed at him and said he was going crazy because he had been locked up too long. Dkt. 55 at 9; *see also* dkt. 51 at 108:18–24. The Court accepts, as it must, Mr. Knighten's account. While such a comment would be insensitive, no reasonable jury could infer from it that Dr. Byrd knew there was a substantial risk of harm to Mr. Knighten and decided to do nothing about it. *See Townsend v. Cooper*, 759 F.3d 678, 690 (7th Cir. 2014) (concluding that doctor's remark that plaintiff was faking his symptoms did not support conclusion that she was deliberately indifferent); *Karraker v. Kankakee Cty. Sheriff's Dep't*, 65 F.3d 170 (table), 1995 WL 508075, at *4 (7th Cir. 1995) ("While relations between the plaintiff and [the nurse] may have been frosty (she evidently thought he was a chronic complainer; he believed he was receiving inferior treatment), an inmate is not constitutionally entitled to a warm bedside manner.").

Accordingly, Dr. Byrd's motion for summary judgment as to Mr. Knighten's claim that he was deliberately indifferent to Mr. Knighten's complaints about a possible parasitic infection is granted.

**2.      Gastrointestinal Issues and Dizziness/Fainting Spells**

Mr. Knighten also contends that Dr. Byrd was deliberately indifferent to his gastrointestinal issues (diarrhea and weight loss) and his dizziness and fainting spells. The Court treats these conditions together because Dr. Byrd's treatment of them was interrelated.

21

The undisputed evidence shows that Dr. Byrd first became aware of Mr. Knighten's dizziness and fainting spells in late December 2017. He thought Mr. Knighten's symptoms were a classic presentation of orthostatic hypotension and noted that Mr. Knighten was taking some medications that could cause orthostatic hypotension. He ordered a chest X-ray, an ECG, and bloodwork to further investigate the problem. While the chest X-ray was normal, the ECG returned findings consistent with orthostatic hypotension. Dr. Byrd then started adjusting the medications Mr. Knighten took to control his diarrhea because those medications are known to cause orthostatic hypotension. The adjustments were not always immediately successful, but Dr. Byrd continued to adjust Mr. Knighten's medications, ordered a follow-up ECG and bloodwork, and provided Mr. Knighten with compression stockings. Eventually, they arrived at a point where Mr. Knighten was not fainting anymore (although he still felt dizzy sometimes), and his ECG, bloodwork, and orthostatic vital signs were normal. Dr. Byrd believed that this improvement was attributable to his reduction of Mr. Knighten's diarrhea medications. Although he recognized that reducing the diarrhea medications could increase Mr. Knighten's diarrhea, he thought that risk was outweighed by the potential benefit of reducing Mr. Knighten's dizziness and fainting spells. After Mr. Knighten's fainting spells had improved, Dr. Byrd also honored Mr. Knighten's request to increase one of the medications he took to control his diarrhea after warning him about the risk that the dizziness and fainting could worsen.

In the meantime, he took steps to investigate and treat Mr. Knighten's gastrointestinal issues. He prescribed Bentyl and Imodium for diarrhea but discontinued the Bentyl and added fiber after Mr. Knighten complained that Bentyl was making things worse. He also ordered a CT scan to investigate Mr. Knighten's weight loss. When the first CT scan was not entirely successful (because the provider could not use IV contrast), he ordered another one. And, while he waited for

the second scan, he acted on the findings from the first scan by taking steps to help Mr. Knighten pass stool more effectively. After the second CT scan, Dr. Byrd honored Mr. Knighten's request for a referral to a gastroenterologist and also gave Mr. Knighten probiotics. When the gastroenterologist recommended a colonoscopy, Dr. Byrd ordered it. And, when the colonoscopy showed an anal stricture, Dr. Byrd sent Mr. Knighten to a surgeon to have the problem corrected.

On this record, no reasonable jury could find that Dr. Byrd was deliberately indifferent to Mr. Knighten's conditions. Instead, the evidence shows that Dr. Byrd was trying to balance two problems—Mr. Knighten's gastrointestinal conditions and the dizziness and fainting that he believed were caused by the medications used to control the gastrointestinal conditions. As with Mr. Knighten's complaints about a parasitic infection, this is not a case where the risk from Dr. Byrd's course of treatment is obvious to a layperson. Thus, his decisions are entitled to a great deal of deference. *See Petties*, 836 F.3d at 729; *Pyles*, 771 F.3d at 409.[13] There is, however, no evidence that Dr. Byrd's chosen course of treatment represented a substantial departure from accepted medical practice or that he knew about and disregarded a substantial risk of harm to Mr. Knighten.

Mr. Knighten contends that there is a genuine issue of material fact as to whether his symptoms were a classic presentation of orthostatic hypotension because he suffered such spells before he ever began taking the medications Dr. Byrd thought were responsible for the problem. Dkt. 55 at 5. This amounts to a disagreement with Dr. Byrd's diagnosis of the problem, which is

---

[13]In his response, Mr. Knighten suggests that Dr. Byrd was not actually exercising his medical judgment, but instead that "[t]he outside Colorectal Surgeon, and CT scans and Colonoscopies was all something that Dr. Byrd was forced to do, because Plaintiff had filed a Civil Complaint because Dr. Byrd had allowed the Plaintiff to suffer for a long period of time." Dkt. 55 at 1. Unsworn speculation of this kind is not admissible at summary judgment. *See Collins*, 462 F.3d at 760 n.1; *Stagman*, 176 F.3d at 995. Moreover, the record shows that Dr. Byrd ordered the CT scans, sent Mr. Knighten to the gastroenterologist, and decided to order the colonoscopy before the clerk screened Mr. Knighten's complaint on July 2, 2018, and before the clerk issued a Notice of Lawsuit and Request of Waive Service of a Summons to Dr. Byrd on July 3, 2018. *See* dkts. 12, 13. There is no evidence that Dr. Byrd knew about the lawsuit before that date.

not enough to sustain an Eighth Amendment deliberate indifference claim absent some evidence that Dr. Byrd's attempts to control what he believed to be orthostatic hypotension represented a substantial departure from accepted medical standards. *See* Pyles, 771 F.3d at 409. There is no such evidence here.

Mr. Knighten also complains that Dr. Byrd never sent him to an outside doctor or ordered an MRI to determine the cause of his dizziness and fainting spells. Dkt. 51 at 91:19–21; dkt. 55 at 1. He notes that he told Dr. Byrd that he was still getting dizzy, even though he had found a way to avoid passing out entirely. Dkt. 51 at 105:2–12. The Court understands this as an argument that Dr. Byrd persisted with his course of treatment even though he knew it was ineffective. A physician may violate the Eighth Amendment if he doggedly persists with a course of treatment that he knows to be ineffective. *See, e.g.*, *Goodloe v. Sood*, 947 F.3d 1026, 1031–32 (7th Cir. 2020) (reversing grant of summary judgment for physician who prescribed inmate medication for almost a year without any signs of improvement before referring inmate to outside specialist and then decided to return to the ineffective medication for at least two more months after the specialist referral had to be canceled rather than immediately sending the inmate to another specialist; reasoning that the record supported a finding that the physician persisted with the ineffective treatment knowing it was not working); *Greeno v. Daley*, 414 F.3d 645, 654–55 (7th Cir. 2005) (reversing grant of summary judgment for medical providers where possibility of an ulcer was noted on the inmate's chart but providers failed to test for that condition and instead doggedly persisted with an obviously ineffective course of treatment for more than a year without trying to find out what was wrong before finally sending the inmate to a specialist, who found that the inmate had an ulcer).

Here, however, there is no designated evidence from which a reasonable jury could infer that Dr. Byrd doggedly persisted with a course of treatment even though he knew it was ineffective. There is no evidence that Dr. Byrd knew or suspected that Mr. Knighten's dizziness and fainting were caused by something other than orthostatic hypotension from Mr. Knighten's other medications. And there is no evidence that Dr. Byrd knew his chosen treatment for Mr. Knighten's dizziness and fainting was ineffective. Instead, the record shows that Mr. Knighten's ECG results returned to normal after treatment and that Mr. Knighten stopped fainting (even if he still got dizzy). This is also not a case where Dr. Byrd ignored Mr. Knighten's ongoing complaints about dizziness. Rather, the record shows that he was trying to balance Mr. Knighten's complaints of dizziness against Mr. Knighten's need (and requests for) for medications that could cause dizziness. These are medical judgments that do not violate the Constitution. *See Duckworth v. Ahmad*, 532 F.3d 675, 682 (7th Cir. 2008) (affirming grant of summary judgment to physician who hypothesized that inmate had urinary tract infection and treated him accordingly, even though it later turned out that inmate had cancer; distinguishing *Greeno* and reasoning, "The evidence here indicates that . . .[the doctor] did not think [the inmate's] condition was anything more serious than a urinary tract infection. These are the kinds of medical assessments doctors can make without running afoul of the Constitution.").

Mr. Knighten also argues that Dr. Byrd was deliberately indifferent to his gastrointestinal conditions because Dr. Byrd would not listen to him about his need for medicine to control his diarrhea and simply cut off the medications used to control his diarrhea rather than doing something about the problem. Dkt. 51 at 91:12–16. It is true that Dr. Byrd reduced the medications used to control Mr. Knighten's diarrhea. But no reasonable jury could infer deliberate indifference from that fact. Viewed in context, the undisputed facts show that Dr. Byrd first reduced the

medications used to control diarrhea because he was trying to treat Mr. Knighten's dizziness and fainting spells and later continued on that course because he believed Mr. Knighten was constipated and needed help moving stool out of his gut. While Mr. Knighten may not have agreed with that course of treatment, such disagreement does not support an Eighth Amendment claim on its own. *See Pyles*, 771 F.3d at 409.

In addition, Mr. Knighten contends that Dr. Byrd was deliberately indifferent to his gastrointestinal conditions because he "kept telling Dr. Byrd, send [him] back to the same place [he] went [for dilation surgery] because [he was] having the same problem" but Dr. Byrd "didn't want to do it." Dkt. 51 at 91:10–12. The undisputed facts establish that Dr. Byrd did, in fact, send Mr. Knighten to have dilation surgery, so the Court understands this as a complaint that Dr. Byrd pursued testing rather than immediately referring Mr. Knighten for surgery when Mr. Knighten suggested the possibility. An inexplicable delay in responding to an inmate's serious medical condition can reflect deliberate indifference, especially if the delay exacerbates the inmate's medical condition or unnecessarily prolongs suffering. *Goodloe*, 947 F.3d at 1031. Mr. Knighten does not designate evidence showing when he asked Dr. Byrd to send him for dilation surgery, so the record is insufficient to support a finding of inexplicable delay. Mr. Knighten's claim creates, at best, a metaphysical doubt as to when Dr. Byrd knew he needed to refer Mr. Knighten for dilation surgery, which is insufficient to avoid summary judgment. *See Matsushita*, 475 U.S. at 586.

Moreover, no reasonable jury could infer deliberate indifference because Dr. Byrd failed to immediately refer Mr. Knighten for dilation surgery. Although the process took some time, the delay was not inexplicable; instead, the undisputed facts show that Dr. Byrd was pursuing testing to determine the best course of action. *Compare with Goodloe*, 947 F.3d at 1032 (finding

26

inexplicable delay where physician failed to refer inmate to new specialist for three months after original specialist appointment was canceled without explanation despite inmate filing complaint two weeks after the original specialist appointment was canceled). Absent some evidence that Dr. Byrd's decision to pursue testing represented a substantial departure from accepted medical standards or other evidence that Dr. Byrd was not actually exercising his medical judgment, his medical decisions are entitled to deference and cannot support an Eighth Amendment claim. *Cf. Lloyd v. Moats*, 721 F. App'x 490, 494 (7th Cir. 2017) ("[A] delay in ordering tests must be evaluated in light of the entire record to determine if it evidences deliberate indifference: The question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment. A medical decision not to order an X-ray, or like measures does not represent cruel and unusual punishment." (internal quotation marks, quoted authority, and alteration omitted)).

Finally, Mr. Knighten contends that Dr. Byrd was deliberately indifferent because he "shouldn't have been prescribing any kind of medication to [Mr. Knighten] until after December 15, 2018." Dkt. 55 at 16. In support, he relies on documents showing that Dr. Byrd voluntarily surrendered the certificate he needed to prescribe controlled substances in February 2015 and that his medical license was placed on indefinite probation beginning in January 2017 and continuing until at least December 15, 2018. *See* dkt. 55-1 at 33, 35–39. Assuming the authenticity and admissibility of these documents, Mr. Knighten still has not created a genuine issue of material fact because the documents show only that Dr. Byrd was on probation and that he could not prescribed controlled substances—not, as Mr. Knighten contends, that Dr. Byrd could not prescribe any medication at all. Mr. Knighten also does not designate evidence suggesting that Dr. Byrd improperly prescribed controlled substances.

Accordingly, Dr. Byrd's motion for summary judgment as to Mr. Knighten's claims of deliberate indifference to his gastrointestinal conditions and his dizziness and fainting spells is granted.

## IV.    Conclusion

The **clerk is directed** to update the names of the Medical Defendants' names on the docket to Dr. Samuel Byrd and Nurse Kimberly Hobson. The **clerk is directed** to update Mr. Knighten's address consistent with the distribution portion of this Entry.

For the reasons stated above, the Medical Defendants' motion for summary judgment, dkt. [46], is **GRANTED**. The claims against Dr. Byrd and Nurse Hobson are **dismissed with prejudice**. Consistent with this ruling, the **clerk shall terminate** Dr. Byrd and Nurse Hobson as defendants.

No partial final judgment shall issue at this time.

**SO ORDERED.**

Date: 7/20/2020

_James Patrick Hanlon_
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

UNDRAY KNIGHTEN
DOC #111206
INDIANA STATE PRISON - Inmate Mail/Parcels
One Park Row
Michigan City, IN 46360

All Electronically Registered Counsel